SUSAN JONES, AND THE NORTH CAROLINA ASSOCIATION OF EDUCATORS, PLAINTIFFS v. THE GRAHAM COUNTY BOARD OF EDUCATION, DEFENDANT

No. COA08-477

(Filed 2 June 2009)

**Constitutional Law— random drug testing—school employees— unreasonable search**

A school board policy mandating random, suspicionless drug and alcohol testing for all employees violated plaintiffs' right be free from unreasonable searches under Article I, Section 20 of the North Carolina Constitution, and the trial court order granting the board's motion for summary judgment was reversed. The employees'

**JONES v. GRAHAM CTY. BD. OF EDUC.**

[197 N.C. App. 279 (2009)]

acknowledged privacy interests outweigh the board's interest in conducting random, suspicionless testing.

Appeal by Plaintiffs from amended order entered 6 February 2008 by Judge James U. Downs in Graham County Superior Court. Heard in the Court of Appeals 1 December 2008.

*Tin, Fulton, Walker & Owen, by S. Luke Largess, for Plaintiffs-Appellants.*

*Roberts & Stevens, P.A., by K. Dean Shatley, II, and Christopher Z. Campbell, for Defendant-Appellee.*

STEPHENS, Judge.

*"The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding."*[1]

The Graham County Board of Education enacted a policy mandating the random, suspicionless drug and alcohol testing of all Board employees. Plaintiffs brought suit contending that the policy violates the North Carolina Constitution's guarantees against unreasonable searches and seizures. The trial court granted summary judgment in favor of the Board of Education. We reverse.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In 2006, the Graham County Board of Education employed approximately 250 teachers, staff, and administrators to serve approximately 1,300 students in three public schools—a high school, a middle school, and an elementary school. All Board employees were subject to the Board's "Alcohol/Drug-Free Workplace Policy" which required all job applicants to pass "an alcohol or drug test" as a condition of employment; required all employees to submit to "an alcohol or other drug test" upon a supervisor's "reasonable cause" to believe that the employee was using alcohol or illegal drugs, or abusing prescription drugs, in the workplace; and required "[a]ny employee placed on the approved list to drive school system vehicles" to submit to "random drug tests." Additionally, the policy mandated the suspension of any employee who, in a supervisor's opinion, was impaired by alcohol or drugs in the workplace.

---

1. *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 687, 103 L. Ed. 2d 685, 716 (1989) (Scalia, J., dissenting) (quoting *Olmstead v. United States*, 277 U.S. 438, 479, 72 L. Ed. 944, 957 (1928) (Brandeis, J., dissenting)).

## JONES v. GRAHAM CTY. BD. OF EDUC.

[197 N.C. App. 279 (2009)]

The Board of Education enacted a new testing policy on 5 December 2006. Significantly, the new policy required all employees to submit to "drug or alcohol testing" upon the policy's implementation and required all employees to submit to random, suspicionless testing thereafter. On 20 April 2007, Plaintiffs Susan Jones—a teacher at the County's high school—and The North Carolina Association of Educators—a statewide association of public school teachers, support personnel, and administrators to which approximately fifty Board of Education employees belonged—filed a complaint seeking to have the new policy declared violative of the North Carolina Constitution.

The Board of Education subsequently revised the new testing policy, answered the complaint, and filed a motion for judgment on the pleadings. The Board attached a copy of the new policy, as revised ("the policy"), to the answer. The policy states that

[a]ll positions of employment within the Graham County School system, including but not limited to administrative, classified, non-classified, part time, full time, temporary, and permanent, shall be designated as safety sensitive positions due to the fact that these positions require work where an inattention to duty or error in judgment will have the potential for significant risk or harm to those entrusted to their care, and the possibility or probability of contact with students and the influence employees have could cause irreparable damage to the health and well being of the students.

The policy specifically defines the classes of employees subject to the policy as follows:

1) athletic coaches[;]

2) bookkeepers[;]

3) cafeteria personnel[;]

4) centralized administrative support personnel[;]

5) centralized support personnel[;]

6) custodians[;]

7) directors and supervisors[;]

8) extracurricular advisors[;]

9) maintenance personnel[;]

10) other instructional personnel[;]

11) principals and assistant principals[;]

12) school-based administrative support personnel[;]

13) student support personnel[;]

14) superintendents[;]

15) teachers[;]

16) teacher assistants[;]

17) transportation personnel excluding bus drivers who are covered separately[; and]

18) substitute teachers[.]

Under the policy, the Board of Education may perform "drug or alcohol testing" in the following instances:

a. Of any employee who manifests "reasonable suspicion" behavior. . . .

b. Of any employee who is involved in an accident that results or could result in the filing of a Workers' Compensation claim.

c. On a random basis of any employee.

d. Of any employee who is subject to drug or alcohol testing pursuant to federal or state rules, regulations or laws.

The policy defines "[d]rug testing" as "the scientific analysis of urine, blood, breath, saliva, hair, tissue, and other specimens of the human body for the purpose of detecting a drug or alcohol."

The policy states that "[t]he collection site is Graham County Schools" and that "[t]he procedures for random selection of employees and the procedures for collection shall be the procedures adopted by the Board of Education as set forth in the random procedure and the collection procedure utilized by Keystone Laboratories[,]" a testing facility located in Asheville. While the policy does not particularly prescribe the specific "specimens" an employee is required to submit, Keystone Laboratories' collection procedure only details the collection of employees' urine. Under the collection procedure, employees are required to "go into the toilet area and void into [a] container." The collection method "does not involve the direct visual observation of employees while providing a urine sample, unless extraordinary circumstances exist as stated in paragraph twelve . . . of the procedure." Paragraph twelve provides, in part, as follows:

For walk-in specimens (those collected in the laboratory), consider an out of range temperature [of the specimen] as reasonable evidence of adulteration or substitution, and collect another specimen under direct observation by a same-gender laboratory employee.

## JONES v. GRAHAM CTY. BD. OF EDUC.

[197 N.C. App. 279 (2009)]

An "out of range temperature" of a specimen collected "in the laboratory" is the only circumstance under which an employee may be directly observed passing urine. Neither the policy nor the collection procedure identify either the entity responsible for collecting employees' specimens or the entity responsible for transporting specimens to Keystone Laboratories.

The policy does not detail the "scientific analysis" that Keystone Laboratories will perform on submitted specimens. The policy does not indicate to whom Keystone Laboratories will submit test results. The Graham County Schools superintendent, however, is required to file all test results in a "locked file cabinet[.]" The policy provides that

[a]ny employee who is found through drug or alcohol testing to have in his or her body a detectable amount of an illegal drug or of alcohol will result in a letter of reprimand being placed in the personnel file and the employee will be offered a one-time opportunity to enter and successfully complete a rehabilitation program that has been approved by the Graham County Board of Education.

In the event of a positive test, an employee can submit "the written test result" to an "independent medical review officer" and can obtain and independently test "the remaining portion of the urine specimen that yielded the positive result." The policy also provides that

[a]n applicant or employee whose drug or alcohol test reported positive will be offered the opportunity of a meeting to offer an explanation. The purpose of the meeting will be to determine if there is any reason that a positive finding could have resulted from some cause other than drug or alcohol use. Graham County Board of Education, through its health and/or human resource officials, will judge whether an offered explanation merits further inquiry.

The policy states that test results will not be reported to law enforcement "unless otherwise required by law[.]"

At the 7 August 2007 Civil Session of Graham County Superior Court, the trial court conducted a hearing on (1) Plaintiffs' motion for summary and declaratory judgment, (2) the Board's motion for judgment on the pleadings, and (3) the Board's motion for summary judgment. The evidence before the trial court included the deposition testimony and affidavit of the school system's superintendent, the deposition testimony of two of the school system's principals, and the deposition testimony and affidavits of the individual Board members:

William Jackie Adams, Mitchell E. Colvard, Ricky Kyle Davis, Pamela Carringer Moody, and Lois Ann Pressley.

Mr. Colvard, the Board's chairman, testified that he does not believe that drug testing constitutes either a search of a person or an invasion of privacy. Mr. Colvard further testified—as did every other Board member—that there was no evidence that any student had ever been injured or put at risk of being injured by an employee whose body contained "a detectable amount of an illegal drug or of alcohol[.]" It is undisputed that there was no evidence of a drug "problem" among Board employees. As to why the Board enacted the policy, Ms. Moody testified as follows:

Q. . . . Okay. Explain to me, if you can, if there's been no student in the 30-plus years that you've been associated with the school system who's been impacted by—harmed in anyway [sic] by an employee using drugs or alcohol, and you've had one employee other than a bus driver failing a mandatory test, one employee identified in the last 20 years, prior to two weeks ago, as having drugs on campus, what is the problem among the school system staff that you're trying to address?

A. As I stated earlier, that this county is becoming aware more than ever of the issue of drugs in our county. I could bring you papers [sic] after paper after paper, and it is all people I know that I went to school with, a lot of them, graduated with, some of them high honors, they're—that are behind bars as we speak.

. . . .

[Q.] Yes, ma'am. For the record, your counsel will know what I mean by this. But I'm going to move to strike your last answer, because I don't think it was responsive to the question I asked you. Let me ask you the question again, okay?

Q. . . . What problem—identified problem with your staff is this policy going to address that the prior policy did not address?

A. Our—

Q. Or are you—

A. —problem?

Q. —or are you trying to preempt a potential problem?

A. The first part is a question. If I understand, let me see. All we did to change our policy was to classify the employees. The policy

didn't change; it just classified the employees that are subject to random drug testing.

. . . .

Q. And my question again is, what problem did the board identify with the staff under the existing policy that required the change to the new policy?

A. I feel like that it—it was just better clarification with the employees, themself [sic], who does this include. Because previously, it was just bus drivers and people who are custodians.

Mr. Adams testified as follows:

Q. What issue were you, as a board member, trying to address by broadening the definition of safety sensitive to include everybody?

A. Just to make the Graham County Schools a safer place for the student [sic] and the employees.

Q. Okay, and my question is, how was it unsafe prior to your changing the policy? What evidence was there—I mean, what— that's what I meant by what problem you were addressing. If there was no evidence of any student ever being harmed up to that point and other than . . . two people's rumors no other information about drug use by staff, what issue were you addressing by broadening the definition?

A. Well, it's the safety-sensitive positions—it would be hard to determine, you know, to me, and if—in my opinion, they're all safety-sensitive positions at school: teacher, bus driver, whatever position you hold.

So I don't—I don't know that they [sic] were a problem—is a reason that we changed the policy to all safety sensitive, you know, I just—I don't . . .

Q. So you were not trying to—you were not trying to address an actual problem at that point?

A. No.

Ms. Pressley testified as follows:

Q. Okay. Can you tell me in your view why the prior policy needed to be changed?

A. To keep the kids—to keep the kids safe and make sure they [sic] ain't nobody on drugs.

Mr. Crisp, the only Board member to vote against the policy, testified that the Board never discussed whether there were any safety concerns or safety issues related to employee drug use.

The school system's superintendent testified in his deposition that the old policy was effective in dealing with drug and alcohol issues among Board employees. The superintendent stated in his affidavit, however, as follows:

> 7. As to each employment category, the safety issues relevant to children are as follows:
>
> a. <u>High-Level of Direct Student Contact</u>. Several categories have extensive, repeated, and daily contact with students. These employees supervise students and/or have the opportunity for direct physical contact with students. These categories include:
>
> i. Athletic coaches, bookkeepers, cafeteria personnel, custodians, extracurricular advisors, maintenance personnel, other instructional personnel, principals, assistant principals, school-based administrative support personnel, student support personnel, teachers, teacher assistants, and substitute teachers.
>
> b. <u>Intermittent Contact with Students</u>: The remaining categories of employees oversee the instruction program of the school system and have the opportunity for significant contact with students. In addition to activities within the schools such as teacher observations, these employees may also serve in direct supervisory roles for extracurricular activities and school-approved field trips. These categories include:
>
> i. Centralized administrative support personnel, centralized support personnel, directors, supervisors, and superintendents.
>
> c. <u>Access to Hazardous Substances and Dangerous Equipment</u>: Due to the nature of the school environment all employees have some access to hazardous substances and/or dangerous equipment. The categories of employees with direct access to such substances or materials as part of their direct job duties include:

i. Athletic coaches, cafeteria personnel, custodians, mainte-
nance personnel, science/chemistry teachers and teacher
assistants, transportation personnel (e.g. mechanics, bus
attendants, etc.) and vocational teachers and teacher
assistants (e.g. auto mechanics, construction technology,
child care, and home economics).

8. Finally, it is also important to note a pre-school is housed in
the central office and the central office shares a parking lot with the
elementary school. Thus, every employee of the Graham County
schools is in the position to have significant contact with students
in some manner during the normal workday.

On 18 January 2008, the trial court granted the Board's motion for
summary judgment and denied "Plaintiffs' [sic] Motions for Judgment
on the Pleadings and for Summary Judgment[.]" In an amended order
entered 6 February 2008, the trial court granted the Board's motion for
summary judgment, denied the Board's motion for judgment on the
pleadings, and denied Plaintiffs' motions for summary and declaratory
judgment. From the amended order, Plaintiffs appeal.

## II. STANDARD OF REVIEW

A party against whom a declaratory judgment is sought may move,
at any time, for a summary judgment in his favor. N.C. Gen. Stat. § 1A-1,
Rule 56(b) (2007). A trial court must grant summary judgment "if the
pleadings, depositions, answers to interrogatories, and admissions on
file, together with the affidavits, if any, show that there is no genuine
issue as to any material fact and that any party is entitled to a judg-
ment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2007). This
Court reviews an order granting summary judgment *de novo. In re Will
of Jones,* 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008); *see also
Piedmont Triad Reg'l Water Auth. v. Sumner Hills, Inc.,* 353 N.C. 343,
348, 543 S.E.2d 844, 848 (2001) ("It is well settled that de novo review is
ordinarily appropriate in cases where constitutional rights are impli-
cated.") (citing *State v. Rogers,* 352 N.C. 119, 124, 529 S.E.2d 671, 674-75
(2000); *Ornelas v. United States,* 517 U.S. 690, 696-97, 134 L. Ed. 2d 911,
918-19 (1996)).

## III. ANALYSIS

We first address Plaintiffs' contention that the policy violates
Article I, Section 20 of the North Carolina Constitution, which provides
as follows:

General warrants, whereby any officer or other person may be com-
manded to search suspected places without evidence of the act

committed, or to seize any person or persons not named, whose offense is not particularly described and supported by evidence, are dangerous to liberty and shall not be granted.

N.C. Const. art. I, sec. 20. Plaintiffs assert that "[o]n its face, the . . . policy violates the prohibition against general warrants[,]" and that the policy violates Article I, Section 20's guarantee against unreasonable searches conducted by the government.[2]

### A. General Warrants

We are inclined to agree that the policy violates the prohibition against general warrants. *See In re Stumbo*, 357 N.C. 279, 297, 582 S.E.2d 255, 266 (2003) (Martin, J., concurring) ("[P]ermitting government actors 'to search suspected places without evidence of the act committed' . . . is tantamount to issuing a general warrant expressly prohibited by the North Carolina Constitution.") (quoting N.C. Const. art. I, sec. 20). However, because we hold, for the reasons set forth below, that the Board's policy violates Article I, Section 20's guarantee against unreasonable searches, we do not reach the question of whether the policy violates the prohibition against general warrants.

### B. Reasonableness

The language of Article I, Section 20 " 'differs markedly from the language of the Fourth Amendment to the Constitution of the United States.' " *State v. McClendon*, 350 N.C. 630, 635, 517 S.E.2d 128, 132 (1999) (quoting *State v. Arrington*, 311 N.C. 633, 643, 319 S.E.2d 254, 260 (1984)); *see also Corum v. Univ. of N. Carolina*, 330 N.C. 761, 783, 413 S.E.2d 276, 290 ("Our Constitution is more detailed and specific than the federal Constitution in the protection of the rights of its citizens.") (citing *Lamb v. Wedgewood S. Corp.*, 308 N.C. 419, 302 S.E.2d 868 (1983); Chief Justice James G. Exum, Jr., *Dusting Off Our State Constitution*, 33 State Bar Quarterly, No. 2 6-8 (1986)), *reh'g denied*, 331 N.C. 558, 418 S.E.2d 664, *cert. denied*, 506 U.S. 985, 121 L. Ed. 2d 431 (1992). Nevertheless, Article I, Section 20 provides protection "similar" to the protection provided by the Fourth Amendment, *State v. Styles*, 362 N.C. 412, 414, 665 S.E.2d 438, 439 (2008); *Stumbo*, 357 N.C. at 293, 582 S.E.2d

---

2. The parties rightly agree that the policy implicates Article I, Section 20's guarantee against unreasonable searches conducted by the government. *See Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 617, 103 L. Ed. 2d 639, 660 (1989) ("[T]he collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable . . . ."); *State v. Carter*, 322 N.C. 709, 714, 370 S.E.2d 553, 556 (1988) ("The withdrawal of a blood sample from a person is a search subject to protection by article I, section 20 of our constitution.") (citing *Schmerber v. California*, 384 U.S. 757, 16 L. Ed. 2d 908 (1966); *State v. Welch*, 316 N.C. 578, 342 S.E.2d 789 (1986)).

at 264 (Martin, J., concurring), and it is well-settled that both Article I, Section 20 and the Fourth Amendment prohibit the government from conducting "unreasonable" searches. *Von Raab*, 489 U.S. at 665, 103 L. Ed. 2d at 701; *Stumbo*, 357 N.C. at 292, 582 S.E.2d at 264 (Martin, J., concurring); *McClendon*, 350 N.C. at 636, 517 S.E.2d at 132. Whether a search is unreasonable, and therefore prohibited by Article I, Section 20, and the proper tests to be used in resolving that issue " 'are questions which can only be answered with finality by [the North Carolina Supreme Court].' " *McClendon*, 350 N.C. at 635, 517 S.E.2d at 132 (quoting *Arrington*, 311 N.C. at 643, 319 S.E.2d at 260).

The North Carolina Supreme Court has stated that we may not construe provisions of the North Carolina Constitution as according lesser rights than are guaranteed by the federal Constitution. *Virmani v. Presbyterian Health Services Corp.*, 350 N.C. 449, 475, 515 S.E.2d 675, 692 (1999); *State v. Jackson*, 348 N.C. 644, 648, 503 S.E.2d 101, 103 (1998); *Carter*, 322 N.C. at 713, 370 S.E.2d at 555. As explained by the Supreme Court in *Virmani*,

"because the United States Constitution is binding on the states, the rights *it* guarantees must be applied to every citizen by the courts of North Carolina, so no citizen will be 'accorded lesser rights' no matter how we construe the state constitution. For all practical purposes, therefore, the only significant issue for this Court when interpreting a provision of our state Constitution paralleling a provision of the United States Constitution will always be whether the state Constitution guarantees additional rights to the citizen above and beyond those guaranteed by the parallel federal provision. In this respect, the United States Constitution provides a constitutional floor of fundamental rights guaranteed all citizens of the United States, while the state constitutions frequently give citizens of individual states basic rights in addition to those guaranteed by the United States Constitution."

*Virmani*, 350 N.C. at 475, 515 S.E.2d at 692 (quoting *Jackson*, 348 N.C. at 648, 503 S.E.2d at 103). Accordingly, we first determine whether the policy violates the Fourth Amendment; if so, the policy also violates Article I, Section 20. *See id.*; *Carter*, 322 N.C. at 714, 370 S.E.2d at 556 ("[A]n individual's constitutional rights under the Constitution of North Carolina must receive at least the same protection as such rights are accorded under the Federal Constitution.") (citing *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 64 L. Ed. 2d 741 (1980)). If we determine that the policy does not violate the Fourth Amendment, we may then pro-

ceed to determine whether Article I, Section 20 provides " 'basic rights in addition to those guaranteed by the [Fourth Amendment].' " *Virmani*, 350 N.C. at 475, 515 S.E.2d at 692 (quoting *Jackson*, 348 N.C. at 648, 503 S.E.2d at 103).

The reasonableness of a governmental search is generally determined "by balancing the nature of the intrusion on the individual's privacy against the promotion of legitimate governmental interests." *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls*, 536 U.S. 822, 829, 153 L. Ed. 2d 735, 743 (2002) (citing *Delaware v. Prouse*, 440 U.S. 648, 654, 59 L. Ed. 2d 660 (1979)). But " 'some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure.' " *Samson v. California*, 547 U.S. 843, 855 n.4, 165 L. Ed. 2d 250, 261 n.4 (2006) (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 560, 49 L. Ed. 2d 1116, 1130 (1976)); *City of Indianapolis v. Edmond*, 531 U.S. 32, 37, 148 L. Ed. 2d 333, 340 (2000) ("A search . . . is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing.") (citing *Chandler v. Miller*, 520 U.S. 305, 308, 137 L. Ed. 2d 513 (1997)). The Fourth Amendment, however, " 'imposes no irreducible requirement of [individualized] suspicion.' " *Earls*, 536 U.S. at 829, 153 L. Ed. 2d at 744 (quoting *Martinez-Fuerte*, 428 U.S. at 561, 49 L. Ed. 2d at 1130). " '[I]n certain limited circumstances, the Government's need to discover . . . latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed by conducting . . . searches without any measure of individualized suspicion.' " *Id.* (quoting *Von Raab*, 489 U.S. at 668, 103 L. Ed. 2d at 704); *see also Skinner*, 489 U.S. at 624, 103 L. Ed. 2d at 664 ("In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion."). Thus, a suspicionless search may be reasonable under the Fourth Amendment where " 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.' " *Griffin v. Wisconsin*, 483 U.S. 868, 873, 97 L. Ed. 2d 709, 717 (1987) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 351, 83 L. Ed. 2d 720, 741 (1985) (Blackmun, J., concurring)).

Where the government alleges "special needs" in justification of a suspicionless search, "courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Chandler*, 520 U.S. at 314, 137 L. Ed. 2d at 523 (citing *Von Raab*, 489 U.S. at 665-66, 668, 103 L. Ed. 2d 685). An important consid-

eration in conducting the inquiry is whether there is "any indication of a concrete danger demanding departure from the Fourth Amendment's" usual requirement of individualized suspicion. *Id.* at 319, 137 L. Ed. 2d at 526. The purpose of the inquiry is "to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Von Raab*, 489 U.S. at 665-66, 103 L. Ed. 2d at 702 (citing *Skinner*, 489 U.S. at 619-20, 103 L. Ed. 2d 639). Conducting the inquiry, the United States Supreme Court has upheld suspicionless searches in the following instances: (1) drug testing of students seeking to participate in competitive extracurricular activities, *Earls*, 536 U.S. 822, 153 L. Ed. 2d 735, *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 132 L. Ed. 2d 564 (1995); (2) searches of probationers, *Griffin*, 483 U.S. 868, 97 L. Ed. 2d 709; (3) drug testing of railroad employees involved in train accidents, *Skinner*, 489 U.S. 602, 103 L. Ed. 2d 639; (4) drug testing of United States customs officials seeking promotion to certain sensitive positions, *Von Raab*, 489 U.S. 656, 103 L. Ed. 2d 685; and (5) searches of government employees' offices by the employer, *O'Connor v. Ortega*, 480 U.S. 709, 94 L. Ed. 2d 714 (1987).

We begin our inquiry by attempting to examine the intrusiveness of the proposed testing procedure.[3] It *appears* from the evidence in the record that the Board will only perform a scientific analysis of employees' urine. However, the policy itself does not specify the "bodily specimen" employees will be required to produce. On the contrary, a plain reading of the policy reveals that the Board "may perform" a "scientific analysis of [employees'] urine, blood, breath, saliva, hair, tissue, and other specimens of the human body for the purpose of detecting a drug or alcohol." We acknowledge that Keystone Laboratories' collection procedure only details the collection of employees' urine and that the policy in one instance *suggests* that employees will only be required to produce urine. Nevertheless, assuming the Board only tests employees' urine, we emphasize that the policy provides that "[a]ny employee who is found through drug or alcohol testing to have in his or her body *a detectable amount* of an illegal drug *or of alcohol*" will be suspended. (Emphasis added.) Although a litany of other provisions in the policy bear directly on the intrusiveness of the testing procedure, we find it

---

3. Although Plaintiffs do not assert that the policy violates any statutory provision, we note that our General Assembly has mandated "that employers who test employees for controlled substances shall use reliable and minimally invasive examinations and screenings and be afforded the opportunity to select from a range of cost-effective and advanced drug testing technologies." N.C. Gen. Stat. § 95-230 (2007). Accordingly, the General Assembly has established "procedural and other requirements for the administration of controlled substance examinations." *Id.*

unnecessary to venture beyond this provision to state that the policy is remarkably intrusive.

We next consider whether Board employees have a reduced expectation of privacy by virtue of their employment in a public school system. Public employees may have reduced expectations of privacy if their employment carries with it safety concerns for which the employees are heavily regulated. *Skinner*, 489 U.S. at 627, 103 L. Ed. 2d at 666. By way of illustration, chemical weapons plant employees are heavily regulated for safety. *Thomson v. Marsh*, 884 F.2d 113 (4th Cir. 1989) (per curiam). There is no evidence in the record before us, however, that any of the Board's employees are regulated *for safety*. We question whether the Board could produce such evidence. The Board errantly relies on the premise that "Fourth Amendment rights . . . are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children." *Vernonia*, 515 U.S. at 656, 132 L. Ed. 2d at 576. The Board, however, fails to account for the explicit teaching of the Supreme Court that because "the nature of [the schools' power over schoolchildren] is custodial and tutelary, [the schools' power] permit[s] *a degree of supervision and control [over schoolchildren] that could not be exercised over free adults.*" *Id.* at 655, 132 L. Ed. 2d at 576. We are unable to conclude from this record that any of the Board's employees have a reduced expectation of privacy by virtue of their employment in a public school system.

Finally, the record in the case at bar is wholly devoid of any evidence that the Board's prior policy was in any way insufficient to satisfy the Board's stated needs. The Board acknowledges that there is no evidence in the record of any drug problem among its employees. There is also a complete want of evidence that any student or employee has ever been harmed because of the presence of "a detectable amount of an illegal drug or of alcohol" in an employee's body. We agree that the Board need not wait for a student or employee to be harmed before implementing a preventative policy. However, the evidence completely fails to establish the existence of a "concrete" problem which the policy is designed to prevent. The need to promote an anti-drug message is "symbolic, not 'special,' as that term draws meaning from [the decisions of the United States Supreme Court]." *Chandler*, 520 U.S. at 322, 137 L. Ed. 2d at 528.

Considering and balancing all the circumstances, we conclude that the employees' acknowledged privacy interests outweigh the Board's interest in conducting random, suspicionless testing. *See T.L.O.*, 469 U.S. at 337, 83 L. Ed. 2d at 732 ("[E]ven a limited search of the person is

a substantial invasion of privacy.") (citing *Terry v. Ohio*, 392 U.S. 1, 24-25, 20 L. Ed. 2d 889 (1968)). Accordingly, we hold that the policy violates Article I, Section 20's guarantee against unreasonable searches.

### C. *Boesche v. Raleigh-Durham Airport Authority*

We reject the Board's assertion that "ample guidance to uphold the Board's drug testing policy" can be found in *Boesche v. Raleigh-Durham Airport Authority*, 111 N.C. App. 149, 432 S.E.2d 137 (1993), *disc. review improvidently allowed and appeal dismissed*, 336 N.C. 304, 442 S.E.2d 320 (1994) (per curiam). The plaintiff in *Boesche* was an airport maintenance mechanic whose job duties generally consisted of "performing preventative maintenance and repairs on airport terminal [HVAC] systems, but plaintiff also had security clearance to drive a motor vehicle 10 M.P.H. in a designated area on the apron of the flight area in order to get access to the systems located on the outside of the building." *Id.* at 154, 432 S.E.2d at 141. Without expressing that the plaintiff was suspected of any individualized wrongdoing, the defendants asked the plaintiff to submit to a urine drug test. *Id.* at 150, 432 S.E.2d at 138. The defendants told the plaintiff that the test was required "pursuant to a Federal Aviation Administration directive requiring that all employees who drive a motor vehicle in the airside of the airport must be tested." *Id.* The plaintiff refused to submit to the test, was fired, and subsequently filed a complaint alleging

> that the actions of the defendants violated his rights to be free from illegal searches and invasion of privacy under the Fourth Amendment to the United States Constitution and Article I, Sections 20, 35 and 36 of the North Carolina Constitution; his rights to due process of law under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 19, 35 and 36 of the North Carolina Constitution; his right not to be discharged from employment in bad faith or for reasons contravening public policy under the common law of North Carolina; and for the common law tort of intentional/negligent infliction of emotional distress.

*Id.* at 151, 432 S.E.2d at 139. The defendants moved to dismiss the complaint under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, and the trial court granted the defendants' motion. *Id.*

On appeal, the plaintiff argued, *inter alia*,

> that the trial court committed reversible error in dismissing plaintiff's constitutional claims against defendant's [sic] random drug

testing procedure policy that afforded plaintiff no prior notice of testing or test procedure, that included no guarantee of confidentiality of test results or immunity from criminal prosecution in the case of a positive result, and that led to plaintiff's termination with no opportunity for a hearing before an impartial tribunal.

*Id.* at 155, 432 S.E.2d at 141. The plaintiff additionally argued that he was not subject to random drug testing because he was neither "(1) a sensitive public employee because of either safety or security reasons or (2) an individual suspected of drug use." *Id.* Citing *Skinner*, 489 U.S. 602, 103 L. Ed. 2d 639, this Court stated that random drug testing of public employees is permissible "where the individual tested was engaged in activity which involved either public safety or safety concerns for others because it was a legitimate governmental interest." 111 N.C. App. at 153-54, 432 S.E.2d at 140. We emphasized that " 'there must be a showing by the employer that the employees required to undergo such testing have responsibilities or duties which are connected to the safety concerns of others.' " *Id.* at 154, 432 S.E.2d at 140 (quoting *Twigg v. Hercules Corp.*, 406 S.E.2d 52, 56 (W.Va. 1990)). Applying those standards to the facts of that case, this Court stated that "the record showed that plaintiff was in a position in which public safety or the safety of others was an overriding concern[,]" and this Court found "that plaintiff, if drug impaired while operating a motor vehicle on the apron of the flight area, could increase the risk of harm to others." *Id.* at 154, 432 S.E.2d at 140-41. In affirming the trial court, we held that the "plaintiff was indeed a sensitive public employee because of safety concerns[]" and that the plaintiff was "subject to random drug testing as a legitimate governmental interest." *Id.* at 155, 432 S.E.2d at 141.

We are wholly unconvinced by the Board of Education's argument that *Boesche* is "dispositive" in the case at bar. In stating that the *Boesche* plaintiff was in a position "in which public safety or the safety of others was an overriding concern," this Court merely held that the defendants had made the showing required by *Skinner* that the plaintiff had "duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." *Skinner*, 489 U.S. at 628, 103 L. Ed. 2d at 667. This Court did not hold that *any* public employee who, "if drug impaired . . ., could increase the risk of harm to others" was subject to urine drug testing. Rather, the Court held that the plaintiff, "if drug impaired *while operating a motor vehicle on the apron of the flight area,* could increase the risk of harm to others." 111 N.C. App. at 154, 432 S.E.2d at 141 (emphasis added).

**JONES v. GRAHAM CTY. BD. OF EDUC.**

[197 N.C. App. 279 (2009)]

The holding in *Boesche* was limited to the specific facts of that case. In the case before us, there is absolutely no evidence in the record which in any way equates the safety concerns inherent in the driving of a motor vehicle on the apron of an airport's flight area with the safety concerns inherent in the job duties of any Board employee. In fact, there is absolutely no evidence in the record that any Board employee whose body contains "a detectable amount of an illegal drug or of alcohol" increases the risk of harm to anyone. For these reasons, *Boesche* is not dispositive in the case at bar.

## IV. CONCLUSION

Lest the American people, and the people of North Carolina in particular, forget the foundational importance of the Fourth Amendment right to be secure against unreasonable searches and seizures, we should recall that the cherished liberties enjoyed in our brief historical moment have been inherited by this generation only because they have been nurtured and protected by earlier generations of Americans so driven in their pursuit of liberty that life itself was not too great a cost to purchase liberty for themselves and their posterity.

*State v. Barnard*, 362 N.C. 244, 259, 658 S.E.2d 643, 652-53 (Brady, J., dissenting), *cert. denied*, —— U.S. ——, 172 L. Ed. 2d 198 (2008). We are cognizant of the fact that the policy was enacted by the duly elected representatives of the people of Graham County. Moreover, the evidence in the record establishes that the policy had ample support by Board employees. Nevertheless, in our view, the policy violates Plaintiffs' rights under Article I, Section 20 to be free from unreasonable searches.[4] Constitutional rights are not lightly cast aside. The trial court's order is reversed.

REVERSED.

Chief Judge MARTIN and Judge WYNN concur.

---

4. Because of this holding, we do not determine whether the policy violates Article I, Section 19.