713 S.E.2d 211 (2011)
In the Matter of T.A.S.
No. COA10-275.
Court of Appeals of North Carolina.
July 19, 2011.
*212 Attorney General Roy Cooper, by Assistant Attorney General Lotta A. Crabtree, for the State.
Geeta Nadia Kapur, Durham, for Juvenile.
BEASLEY, Judge.
T.A.S.[1] appeals the trial court's order denying her motion to suppress evidence obtained during a school-wide student search at the Brunswick County Academy (Academy) that extended from the students' personal effects and jackets to their pockets, shoes, and socks and finally beneath the girls' outer clothing. Following the trial court's ruling, T.A.S. admitted to the offenses while "preserving her right to appeal the denial of her motion to suppress." Where the blanket search of the entire school lacked any individualized suspicion as to which students were responsible for the alleged infraction or any particularized reason to believe the contraband sought presented an imminent threat to school safety, the search of T.A.S.'s bra was constitutionally unreasonable and we reverse the trial court's order denying her suppression motion.

I. Background
Charged with possession of a Schedule III substance and drug paraphernalia, T.A.S. filed a motion to suppress, which was heard on 20 February 2009. Sandra Robinson, the Academy's principal and the State's only witness, testified that the Academy is an alternative school in the Brunswick County School System. Many of its students are assigned there because of disciplinary infractions at traditional schools, including behavioral problems and substance abuse or weapons violations on campus. While T.A.S. was a student at the Academy in November 2008, the record does not indicate the basis for her attendance.
To enter the Academy, students must pass through a metal detector, at which time their book bags, purses, and coats are also searched. More thorough searches of their persons are frequently conducted, sometimes in response to information from other students but regularly without any "leads." On *213 5 November 2008, one of these more extensive searches was ordered after Ms. Robinson was informed by other students that pills of a type that "would cause kids to be unsafe" were currently coming into the school but had no further clues as to their nature or which students were responsible. The only details learned by administrators were that some of these students were hiding the pills in places not normally searched when they came through the metal detectors, like shoe tongues, socks, bras, and underwear.
After passing through the metal detectors that morning, all students were required to wait in the lunchroom to be brought one-by-one to a classroom to be searched, where they emptied their book bags, had their jackets thoroughly searched, removed their shoes, and emptied their pockets. A staff member whose sex is not specified in the record conducted the searches and patted down the students' socks. The girls were required to perform a "bra lift," where they "pull their shirts out," "shake them," and "go underneath themselves with their thumb in the middle of their bra [to] pull it out."[2] Other administrators and a resource officer, whose sexes are likewise unspecified, were also in the room, and a male law enforcement officer was present throughout-apparently regardless of the sex of the student being searched-solely to observe. During T.A.S.'s search, a white powder identified as Percocet and drug paraphernalia were found.
The trial court found "[t]here was no specific information regarding a particular student" and that a general search was nevertheless conducted "without any reasonable suspicion as to a particular student." Nevertheless, it concluded that the search was reasonable under the circumstances based on companion findings that many Academy students are there because "of school policy violations regarding drugs and weapons"; pills, often prescribed to someone else, are found at the Academy two to three times every nine weeks; there is a "no penalty disclosure" policy in place during these searches; "[g]eneralized searches for weapons have been upheld because of special circumstances that permitted requiring male students to take off shoes, socks and empty pockets because of reports of weapons at school"; and "[n]o private parts were exposed" during the instant search. The trial court thus denied T.A.S.'s motion. We conclude, however, that at the point the Academy required T.A.S. to pull out her bra in searching her person for evidence of pills of an unknown nature and quantity, "the content of the suspicion failed to match the degree of intrusion," Safford Unified Sch. Dist. # 1 v. Redding, ___ U.S. ___, ___, 129 S.Ct. 2633, 2636, 174 L.Ed.2d 354, 359 (2009), and the search was accordingly unreasonable.

II. Discussion
Where T.A.S. does not challenge any of the trial court's findings of fact in its order denying her motion to suppress, we must decide whether the findings support its conclusions of law, which we review de novo. "Under this standard, the legal significance of the findings of fact made by the trial court is a question of law for this Court to decide." In re J.D.B., 196 N.C.App. 234, 237, 674 S.E.2d 795, 798 (2009).
T.A.S. contends the intrusive search by school authorities violated her Fourth Amendment rights. We agree.
We begin by reviewing the United States Supreme Court's treatment of public school searches under the Fourth Amendment from articulating a special standard twenty-five years ago to its recent decision applying the established framework to more intrusive searches.

The Fourth Amendment and Student Searches
The Fourth Amendment functions "to safeguard the privacy and security of individuals against arbitrary invasions by government officials." Camara v. Mun. Court, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930, 935 (1967). While its prohibition against unreasonable searches and seizures generally requires a warrant based on *214 probable cause, see U.S. Const. amend. IV, exceptions to the warrant requirement have surfaced, but such warrantless searches usually still require probable cause, see New Jersey v. T.L.O., 469 U.S. 325, 340, 105 S.Ct. 733, 740, 83 L.Ed.2d 720, 734 (1985) ("Ordinarily, a searcheven one that may permissibly be carried out without a warrantmust be based upon `probable cause' to believe that a violation of the law has occurred."). The Court, however, has carved out other exceptions that dispense with both the warrant and probable cause requirements. See Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 652-53, 115 S.Ct. 2386, 2390-91, 132 L.Ed.2d 564, 574 (1995) (noting "the ultimate measure of the constitutionality of a governmental search" is reasonableness, which is not always dependent upon a warrant and probable cause if "`special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable'"). Reasonableness thus "depends on the context within which a search takes place," and while probable cause and a warrant may render a search reasonable, certain limited circumstances require neither. T.L.O., 469 U.S. at 337, 340, 105 S.Ct. at 740, 742, 83 L.Ed.2d at 731, 734. Public schools are one context where balancing government against private interests "suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause." Id. at 341, 105 S.Ct. at 742, 83 L.Ed.2d at 734.
Although schoolchildren have legitimate expectations of privacy and public school officials are state actors subject to the Fourth Amendment, the Court in T.L.O. explained that "the special needs of the school environment require assessment of the legality of such searches against a standard less exacting than that of probable cause." Id. at 333 n. 2, 105 S.Ct. at 738 n. 2, 83 L.Ed.2d at 728-29 n. 2. Instead, the legality of a student search is governed by the reasonableness under the circumstances, which is a two-part inquiry: (1) was the action "justified at its inception"; and (2), was "the search, as actually conducted . . . reasonably related in scope to the circumstances which justified the interference in the first place." Id. at 341, 105 S.Ct. at 743, 83 L.Ed.2d at 734 (emphasis added) (internal quotation marks and citations omitted).
Under ordinary circumstances, a search of a student by a teacher or other school official[3] will be "justified at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.
Id. at 341-42, 105 S.Ct. at 743, 83 L.Ed.2d at 734-35 (emphasis added). Under this test, the search of fourteen-year-old T.L.O.'s purse by the assistant principal was justified at its inception where a teacher had accused T.L.O. and another student of smoking in the restroom; the other student admitted the charge but T.L.O. denied it; a cursory search of T.L.O.'s purse revealed a pack of cigarettes and package of cigarette rolling papers, known to the administrator to implicate drug use; and marijuana was found upon a subsequent, more thorough search of T.L.O.'s purse. Id. at 328, 105 S.Ct. at 735-36, 83 L.Ed.2d at 726. Based on the facts, the Court did not decide if the reasonableness inquiry requires individualized suspicion. See T.L.O., 469 U.S. at 342 n. 8, 105 S.Ct. at 743 n. 8, 83 L.Ed.2d at 735 n. 8 ("Because the search of T.L.O.'s purse was *215 based on an individualized suspicion that she had violated school rules," the facts of the case did not require the Court to "consider the circumstances that might justify school authorities in conducting searches unsupported by individualized suspicion.").
Where searching T.L.O.'s purse was clearly less intrusive than searching a student's person, the Court likewise had no occasion to address the applicability of the "twofold inquiry" or the requisite level of suspicion to a search involving, e.g., a pat-down, "bra-lift," or removal of outer clothing. Recently, however, some lingering questions were resolved where the Court applied the T.L.O. framework to new facts in Reddingthe strip search-and also sought to clarify the law. See Redding, ___ U.S. at ___, 129 S.Ct. at 2643, 174 L.Ed.2d at 366 (noting the lower courts' "divergent conclusions" in applying T.L.O. to such searches). Redding evaluated the constitutionality of a student strip search under the same reasonableness test that was applied to T.L.O.'s purse despite the distinct nature of the two searches. But similar to T.L.O., there was an individualized suspicion that thirteen-year-old Savana Redding was violating a school rule. See id. at ___, 129 S.Ct. at 2640, 174 L.Ed.2d at 362-63.[4] In its analysis, the Court first discussed "the reliable knowledge element," which is often assessed "by looking to the degree to which known facts imply prohibited conduct," and explained that "the standards are fluid concepts that take their substantive content from the particular contexts." Id. at ___, 129 S.Ct. at 2639, 174 L.Ed.2d at 361-62 (internal quotation marks and citation omitted). Distinct from the "fair probability" or "substantial chance" standards attendant to probable cause, "[t]he lesser standard for school searches could as readily be described as a moderate chance of finding evidence of wrongdoing." Id. at ___, 129 S.Ct. at 2639, 174 L.Ed.2d at 362.
The Court then examined the facts upon which the assistant principal's particularized suspicion was based and held that his search of Savana's backpack and a female administrator's search of her outer clothing-including her jacket, socks, and shoeswere justified. Id. at ___, 129 S.Ct. at 2649, 174 L.Ed.2d at 363. However, when the nurse subsequently required Savana to remove her clothes down to her underwear and directed her to "pull her bra out and to the side and shake it," id. at ___, 129 S.Ct. at 2638, 174 L.Ed.2d at 360, "the content of the suspicion failed to match the degree of intrusion," id. at ___, 129 S.Ct. at 2642, 174 L.Ed.2d at 364, which subjected her private parts to some degree of exposure. Thus, while the search of Savana's outer clothing and backpack was justified at its inception and not excessively intrusivesatisfying the two-pronged T.L.O. inquirythe known "nature and limited threat" of the pain relievers sought, the absence of reasonable grounds "to suspect that large amounts of the drugs were being passed around," and the lack of any indication "that Savana was hiding common painkillers in her underwear" rendered the strip search unreasonable. Id. at ___, 129 S.Ct. at 2642-43, 174 L.Ed.2d at 365. In reaching this conclusion, the Court explained that "the categorically extreme intrusiveness of a search down to the body of an adolescent requires some justification in suspected facts," and "a reasonable search that extensive calls for suspicion that pays off." Id. Simply put, "general background possibilities fall short," as evidenced in Redding:

*216 [W]hat was missing from the suspected facts that pointed to Savana was any indication of danger to the students from the power of the drugs or their quantity, and any reason to suppose that Savana was carrying pills in her underwear. We think that the combination of these deficiencies was fatal to finding the search reasonable.
Id. The Court then announced a new standard, within the T.L.O. framework, for strip searches which, to be reasonable in scope, "require the support of reasonable suspicion of danger or of resort to underwear for hiding evidence of wrongdoing before a search can reasonably make the quantum leap from outer clothes and backpacks to exposure of intimate parts." Id.
Where T.L.O.'s reasonableness requirement did not address whether individualized suspicion is vital, Redding discussed the element only in reference to the additional strip search requirementsnot with respect to the decision to search Savana in the first placeas there were already reasonable grounds to suspect her. T.L.O. made clear that exceptions to the individualized suspicion requirement "are generally appropriate only where the privacy interests implicated by a search are minimal and where other safeguards are available to assure that the individual's reasonable expectation of privacy is not subject to the discretion of the official in the field." Id.[5] (emphasis added) (internal quotation marks and citation omitted); see also Foster v. Raspberry, 652 F.Supp.2d 1342, 1349 (M.D.Ga.2009) (stating that, with "very limited exception," school officials must have reasonable grounds to believe the particular student searched possesses the contraband for the search to be sound). Although the Court has thus not ruled "whether strip searches ever could possibly be justified in the absence of prior individualized suspicion of the student subjected to the search," Gardner, supra, 80 Miss. L.J. at 976, we hold that inherent in the validity of any search that goes beyond a student's outer clothing is a requirement that, at the very least, school officials suspect the particular student to be offending a school rule.
Our determination is consistent with the decisions of many other courts that strip searches of groups of students absent individualized suspicion were unreasonable. See, e.g., Knisley v. Pike County Joint Vocational Sch. Dist., 604 F.3d 977 (6th Cir.2010) (strip search of entire class for missing credit card); Beard v. Whitmore Lake Sch. Dist., 402 F.3d 598 (6th Cir.2005) (strip search of entire class for stolen money); Thomas ex rel. Thomas v. Roberts, 261 F.3d 1160 (11th Cir.2001) (strip search of 13 fifth graders for $26); Pendleton v. Fassett, No. 08-227-C, 2009 WL 2849542 (W.D.Ky. Sept.1, 2009) (search of 40 to 60 alternative school students based on general suspicion that someone on bus may have marijuana); see also H.Y. ex rel. K.Y. v. Russell County Bd. of Educ., 490 F.Supp.2d 1174 (M.D.Ala.2007); Carlson ex rel. Stuczynski v. Bremen High Sch. Dist. 228, 423 F.Supp.2d 823, 826-27 (N.D.Ill.2006); Rudolph ex rel. Williams v. Lowndes County Bd. of Educ., 242 F.Supp.2d 1107, 1115-16, (M.D.Ala.2003); Bell v. Marseilles Elementary Sch., 160 F.Supp.2d 883, 887-88 (N.D.Ill.2001); Konop ex rel. Konop v. Nw. Sch. Dist., 26 F.Supp.2d 1189, 1206-07 (D.S.D.1998); Cales v. Howell Pub. Schs., 635 F.Supp. 454 (E.D.Mich.1985); Kennedy v. Dexter Consol. Schs., 129 N.M. 436, 10 P.3d 115, 120-22 (2000).

B. The Suspicionless Search of T.A.S.
While certain aspects of the search here may have been reasonable based on the general suspicion that pills were coming into the schoolpossibly by concealment in some students' undergarmentsthe search of T.A.S.'s bra, without individualized grounds for suspecting that she had the pills on her *217 person, was excessively intrusive. Once the search extended to such intimate places, the generalized suspicion upon which the trial court relied was no longer sufficient to justify the heightened intrusion. Thus, in light of T.L.O. and Redding, the search was not reasonable under the circumstances.
As in Redding, Academy administrators "ma[d]e the quantum leap from outer clothes and backpacks," Redding, ___ U.S. at ___, 129 S.Ct. at 2643, 174 L.Ed.2d at 365, by requiring each female student to do a "bra lift" by pulling out her shirt, shaking it, and going underneath her shirt to pull her bra away from her body. Before examining the (un)reasonableness thereof, we emphasize that any differences in the level of exposure from one strip search to another are not of kind, but degree. The fact that T.A.S. was not unclothed when required to perform the "bra lift" thus does not negate the nature of the search or render Redding inapplicable. While Ms. Robinson stated "[n]o body parts are seen" and the trial court found that "[n]o private parts were exposed," the Redding Court declined to "define strip search and its Fourth Amendment consequences in a way that would guarantee litigation about who was looking and how much was seen." Id. at ___, 129 S.Ct. at 2641, 174 L.Ed.2d at 364. To the contrary, Redding stressed that "[t]he very fact of Savana's pulling her underwear away from her body in the presence of the two officials who were able to see her necessarily exposed her breasts and pelvic area to some degree." Id. We thus examine the search of T.A.S. under the attendant circumstances in the context of a strip search. See id. ("The exact label for this final step in the intrusion is not important, though strip search is a fair way to speak of it."); see also Amaechi v. West, 237 F.3d 356, 365 & n. 15 (4th Cir.2001) (noting many statutes define strip search as having a "person remove or arrange some or all of his clothing so as to permit a visual inspection of the . . . female breasts, or undergarments of such person." (emphasis added)); State v. Battle, ___ N.C.App. ___, ___, 688 S.E.2d 805, 810-11 (noting that neither the U.S. Supreme Court nor our Courts have defined "strip search" but citing Redding for the proposition that an officer's requiring an adult driver "to pull the bottom of her bra away from her body and shake the bra" without "remov[ing] her shirt or lift[ing] it up" and to unzip and open her pants but not pull them down is fairly referred to as a strip search), disc. review denied, ___ N.C. ___, 700 S.E.2d 926 (2010).
Here, the Academy's blanket personal search was predicated on information from "students" and vague references to "pills." Administrators learned that "pills were coming into the school" and that "[i]t was currently happening." The record does not identify who the student informants were or, more importantly, indicate that school officials took any measures to assess their reliability. Moreover, the school had no particulars about the pills: there was no indication of the harm they presented or the quantity in circulation. As such, there was no specific ground to believe the pills were dangerous, illegal, or even against school policyother than the vague notion that they "would cause kids to be unsafe" or that they were possessed in large quantities. Thus, at its very inception, the Academy's search of its entire 134-member student body is undermined by the fact that the so-called "lead" acted upon was provided by "students." These student informants also raised the possibility that the pills were being hidden in places that Academy officials did not generally check when students entered through the metal detectors, such as socks, tongues of shoes, and their underwear and bras. No postulation as to which students might be concealing pills in this manner was shared with the authorities, and the more intrusive search of all the Academy's female students was thus based on an unparticularized suggestion that some students may be concealing such pills in their undergarments, which were subjected to exposure in front of officials of the opposite sex.
The Redding Court thoroughly discussed the facts known to the assistant principal based on reports of staff members which corroborated the student informant's allegationsthat provided the grounds for conducting any search of Savana's belongings or her person. While the individualized accusation was sufficient to conduct the less intrusive search of her outer clothing, no further intrusion was permissible where the assistant *218 principal had failed to "ask Marissa any followup questions to determine whether there was any likelihood that Savana presently had the pills: neither asking when Marissa received the pills from Savana nor where Savana might be hiding them." Redding, ___ U.S. at ___, 129 S.Ct. at 2640, 174 L.Ed.2d at 363. Moreover, the assistant principal "knew beforehand that the pills were prescription-strength ibuprofen and over-the-counter naproxen, common pain relievers equivalent to two Advil, or one Aleve." Id. at ___, 129 S.Ct. at 2642, 174 L.Ed.2d at 364-65. In this case, the lack of information as to the nature of the pills cuts both ways. While the Academy clearly had no particularized basis for believing that the pills were dangerous because the school knew absolutely nothing about the kind of pills sought, it is also arguable that this same uncertainty presented a more expedient problem. However, especially with the lack of any other corroborating information, this circumstance demanded further investigation, if not before the school undertook to conduct a group search of pockets, shoes, and socks, unquestionably before intruding beneath the clothing of every student at the school.
In Redding, the Court suggests that school officials should make reasonable efforts to investigate allegations of misconduct before searching, especially if a more intrusive search is being contemplated. . . . .
. . . T.L.O. demonstrated that the reasonable suspicion required to justify a school search may be evidenced by a good faith, common sense narrative explaining how a search was founded on the available information and a reasonable interpretation of this information rooted in professional judgment and experience. In Redding, the Court appears to be further emphasizing that school officials must also use good faith efforts to investigate prior to conducting a search, especially an intrusive search, in order to obtain relevant information that could more accurately guide or prevent an intrusive search, especially when this can be done with little cost, delay, or risk. In reasonably attempting to get answers to the relevant, fundamental questions of who, what, when, where, how, and why prior to a search, school officials are likely to be on much firmer constitutional ground than in searching without making prior good faith efforts to acquire readily obtainable information relevant to the contemplated search.
John Dayton & Anne Proffitt Dupre, Searching for Guidance in Public School Search and Seizure Law: From T.L.O. to Redding, 248 Educ. L. Rep. 19, 28-29 (2009). Another scholar agrees:
To permit any one of the vague indications that drugs are hidden in the undergarments to justify a strip search is unreasonable. For example, a general practice among students of hiding pills in their underwear at the school should not suffice to warrant a strip search. Next, it would be dangerous to allow school officials to base a strip search of a student on an incriminating statement by another student without making sure the statement has some level of credibility. Courts should require school officials to follow up on tips as much as reasonably possible to assure that they are reliable enough to warrant an intrusive strip search. Specifically, the credibility of the tip should be examined before strip searching. Finally, as happened in Redding, school officials sometimes obtain information about contraband one day, and the strip search is performed on another day. This situation raises concerns about the certainty that the contraband is located where a strip search would be necessary to uncover it. All of these factors represent obstacles school officials should overcome before they possess reasonable suspicion under the Fourth Amendment that a student is carrying drugs in his undergarments. Generic evidence suggesting drugs are located in a student's undergarments should not be enough for a strip search.
Timothy J. Petty, Safford Unified School District v. Redding and School Strip Searches: Almost, but Not Quite There Yet, 41 Seton Hall L.Rev. 427, 452-53 (2011) (footnotes omitted). Even in Phaneuf v. Fraikin, 448 F.3d 591 (2d Cir.2006), which did involve individualized suspicion, a strip search violated the Fourth Amendment, even *219 in light of the following facts: a fellow student's tip specifically accused Phaneuf of hiding marijuana "down her pants" during a bag check; Phaneuf had a history of disciplinary problems; her denial of the allegations was suspicious and suggested she was lying; and cigarettes were discovered in her purse. Phaneuf, 448 F.3d at 593-94. School officials even called her mother to conduct the strip search, but these facts were not enough to justify the search because no evidence showed that the student-informant was reliable in general, nothing corroborated the specific tip, and Phaneuf's past misbehavior did not involve drug use. Id. at 592-94.
As in Redding and Phaneuf, Academy officials failed to ask additional questions to determine the exigency of the situation. Rather than conduct intrusive bra-lifts, the school should have followed up with the student informants to ascertain the identity of the violators or inquired further to determine the nature of the substances. Moreover, while not expedient but to ensure Fourth Amendment protections along with the dignity and sanctity of T.A.S. and the other girls, T.A.S.'s parents could have been called before the bra-lift was conducted. These failures clearly weaken the argument that the search of T.A.S. was constitutional, as they indicate that Redding's additional factors appended to the "reasonableness-in-scope" prong of the T.L.O. standard when a search extends beneath the outer clothingnamely, "reasonable suspicion of danger or of resort to underwear"were not met here. Still, it is the lack of any reason to suspect T.A.S. that is the fatal element here. The trial court, however, relied on "cases where special circumstances" eliminated the need for individualized suspicion and suspicionless searches were upheld, but, of the examples listed in its order, the only one relevant to the context here "involved random drug testing of student athletes."
A decade after T.L.O., the Supreme Court revisited the individualized suspicion question and held random, suspicionless drug testing of student athletes does not violate the Fourth Amendment's prohibition against unreasonable searches. Vernonia, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564. Board of Education v. Earls, 536 U.S. 822, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002), extended this holding to all students participating in extracurricular activities. It may at first appear that the realm of students' Fourth Amendment rights cases can be separated into two lines characterized by whether the search at issue was suspicion-based or not. It is crucial, however, to highlight the distinctions of the Court's suspicionless search holdings in order to assess the proper impact of these decisions on the case here. Moreover, with the advent of Redding, the Supreme Court's supplemental guidance as to more intrusive searches must be considered in any strip search case, regardless of the level of suspicion involved.
Contextually, the suspicionless urinalysis cases emphasize that the voluntary nature of participation in these activities allows for a higher intrusion of privacy. See Vernonia, 515 U.S. at 657, 115 S.Ct. at 2393, 132 L.Ed.2d at 577 ("By choosing `to go out for the team,' [school athletes] voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally."); see also Pacheco v. Hopmeier, No. 09-cv-1207 BB/DJS, 2011 WL 907561, at *15 (D.N.M. Mar.9, 2011) (applying T.L.O. to hold suspicionless unreasonable and rejecting as inapposite Vernonia and Earls, whose "rationale obviously distinguishes searches conducted on student participants in extracurricular activities from the general student body"); State v. Gage R., 149 N.M. 14, 243 P.3d 453, 457 (N.M.Ct.App.2010) (describing the "special needs" school cases as "a very limited exception to the reasonable suspicion requirement that permits searches of public school students" and finding it significant that "these cases involve obtaining consent through a threatened withholding of a benefit when consent is not given" such that "the `special needs' doctrine has [no] application" to a search of a student's backpack). The voluntariness factor in the urinalysis context is clearly distinct from suspicionless personal searches of students participating only in the regular curriculum, as required by state law, during the academic part of the school day. Even if Vernonia can apply to searches of any student's person where government interests *220 are compelling,[6] the factual distinctions reveal that the search here does not belong in a class where generalized suspicion is sufficient.
The searches conducted without individualized suspicion in Vernonia and Earls passed muster pursuant to three factors: (1) the nature of the interest intruded upon and the student's legitimate expectation of privacy therein; (2) the character of the intrusion complained of; and (3) the nature and immediacy of the school's concern at and the efficacy of the means chosen to meet it. Vernonia, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564.
As discussed above, the lesser degree of privacy afforded students generally is further reduced by voluntary participation in an extracurricular activity such that "intrusions upon normal rights and privileges, including privacy" should be expected. Id. at 657, 115 S.Ct. at 2393, 132 L.Ed.2d at 577. In this case, the trial court emphasized "the nature and selection of the student body" at an alternative school, but the record does not indicate whether T.A.S. was assigned to the Academy because of prior substance abuse or whether she had any past disciplinary problems involving drugs at all. Moreover, the makeup of the Academy's student population does not outweigh T.A.S.'s privacy interest against subjecting her unclothed body to exposure. Despite the trial court's finding that "[n]o private parts were exposed to support its order, the Redding Court declined to ascribe any significance to whether anyone saw anything and explained that the very act of students' pulling their underwear away from their bodies in the presence of school officials who could see the students necessarily exposed some degree of nakedness, and "reasonable societal expectations of personal privacy support the treatment of such a search as categorically distinct, requiring distinct elements of justification on the part of school authorities for going beyond a search of outer clothing and belongings." Redding, ___ U.S. at ___, 129 S.Ct. at 2641, 174 L.Ed.2d at 364 (emphasis added); see also T.L.O., 469 U.S. at 337-38, 105 S.Ct. at 740-41, 83 L.Ed.2d at 740-41 ("A search of a child's person . . . is undoubtedly a severe violation of subjective expectations of privacy.").
T.A.S. thus clearly had a legitimate expectation of privacy beneath her outer clothing and had no reason to believe that her body would be subjected to exposure, especially when school officials had no basis for suspecting her. For, notwithstanding the fact that she attends an alternative school and is subjected to other, lesser intrusions upon entry each day, "when the categorically extreme intrusiveness of a search down to the body of an adolescent requires some justification in suspected facts, general background possibilities fall short; a reasonable search that extensive calls for suspicion that it will pay off." Redding, ___ U.S. at ___, 129 S.Ct. at 2642, 174 L.Ed.2d at 365 (emphasis added). While attending an alternative school may compel the students to expect to be subjected to the inconvenience of passing through a metal detector or the moderate intrusiveness of having their backpacks searched each day, such does not demand an expectation that their underwear will be searched. Redding's indication that strip searches are sui generis, intruding on a privacy interest distinct from all other types of searches, suggests that the suspicionless search rationale of Vernonia and the cases upon which it relies will not support a search of this kind, as "the content of the suspicion [will undoubtedly] fail[] to match the degree of intrusion." Id. at ___, 129 S.Ct. at 2642, 174 L.Ed.2d at 364.
Moreover, in contrast to the minimal intrusion associated with urinalysis, the bra-lift at issue was degrading, demeaning, and highly intrusive. In collecting students' urine samples: (i) no body parts were exposed and the conditions were nearly identical to using any public restroom; (ii) one official of the same *221 gender as the students monitored the production of the sample; and (iii) the results of the search were "not turned over to law enforcement authorities or used for any internal disciplinary function." Vernonia, 515 U.S. at 658, 115 S.Ct. at 2393, 132 L.Ed.2d at 577-78. The process engaged in by the Academy was critically different: (i) school officials in the room with T.A.S. during the search could have positioned themselves to see her bra or breasts, see Redding, ___ U.S. at ___, 129 S.Ct. at 2642, 174 L.Ed.2d at 364; (ii) according to Ms. Robinson, there were not only "a couple of administrators" in the room with T.A.S. but also "the school resource officer" and a male official referred to as "Captain White" who runs the school's alternative to suspension program, see Thomas R. Hooks, A Rock, a Hard Place, and a Reasonable Suspicion: How the United States Supreme Court Stripped School Officials of the Authority to Keep Students Safe, 71 La. L.Rev. 269, 296 (2010) (observing that courts generally interpret the requirement of T.L.O.'s permissibility-in-scope prong that the search not be excessively intrusive in light of the sex of the student to mean the school officials conducting the strip search "must be of the same sex as the student"); and (iii) the results of the search were indeed turned over to law enforcement authorities for use in the instant juvenile delinquency action, see Pendleton, 2009 WL 2849542, at *5 (citing Doe ex rel. Doe v. Little Rock Sch. Dist., 380 F.3d 349, 355 (8th Cir.2004), where a suspicionless search of students' pockets and belongings "was `qualitatively more severe than that in Vernonia and Earls' because the possibility existed that the police would bring criminal charges against [the student] as a result of items found during the search"). Redding's validation of Savana's account of the strip search as "embarrassing, frightening, and humiliating" as reasonable and the observation that "adolescent vulnerability intensifies the patent intrusiveness of the exposure" further suggest that the search extending beneath thirteen-year-old T.A.S.'s outer clothing was extremely more invasive than the searches in the drug-testing cases.
Finally, while deterring drug use by students is clearly an important governmental interest, Vernonia, 515 U.S. at 661, 115 S.Ct. at 2395, 132 L.Ed.2d at 579, and possibly even more weighty at the Academy where many students have been in violation of the school district's substance abuse policy, "[t]he government's interest is `diluted' when a school searches a group of students `without reason to suspect that any particular student was responsible for the alleged' infraction." Pendleton, 2009 WL 2849542, at *5 (citation omitted); see also Knisley, 604 F.3d at 981 ("The lack of individualized suspicion and the search of the entire class further diminish the defendants' interest. . . ."). Indeed, "without any individualized suspicion, `the intrusiveness of the search of each individual is that much less likely to be successful.'" Pendleton, 2009 WL 2849542, at *5 (quoting Beard, 402 F.3d at 605). Here, despite the complete lack of any reasonable belief than any single student possessed any pills, the Academy searched all 134 of its students. Further, the school required all of the girls to perform the "bra lift" even if nothing revealed during the less intrusive part of the search suggested that the student was hiding contraband in her underwear. A search of the entire student body based on vague tips from unidentified students where no follow-up investigation was made to determine who the actual perpetrators may be, how many students were estimated to be bringing pills into the school, or the nature and level of danger of the pillswas not an appropriate method of discovering the wrongdoers. See Redding, ___ U.S. at ___, 129 S.Ct. at 2635, 174 L.Ed.2d at 362 (holding the required knowledge under the reasonable suspicion standard is that a school administrator's search of each student must forecast "a moderate chance of finding evidence of wrongdoing").
As summarized by one scholar,
Application of these three factors to the student strip search reveals that such a search will only be reasonable when a school official possesses an individualized suspicion.
First, the average student possesses a very legitimate expectation that he or she will not be subjected to a strip search. Second, it is nearly impossible to imagine a search more intrusive than one requiring a *222 student to expose his or her naked body to a school official. As for the third factor, although schools do indeed have a compelling interest in deterring drug use and violence, when weighed against the students' interest in not being strip searched and the excessively intrusive nature of such searches, it may not be so compelling as to justify a blanket strip search of a group of children. The interest in preventing theft is even less compelling because of the absence of potential physical harm. Clearly, these three factors, especially the intrusive nature of these searches, weigh heavily in favor of a rule prohibiting the strip search of a student absent individualized suspicion.
Hooks, supra, at 305-06 (footnotes omitted). As applied here, it is indeed apparent that this case is distinct from the many decisions striking down group strip searches where the object of the search was stolen money or the theft other items. Where drugs are concerned, however, the overwhelming majority, if not all, of the rulings upholding searches that extended beneath the student's outer clothing involved an individualized suspicion that the particular student searched was responsible for the alleged violation.[7]See, e.g., Bridgman ex rel. Bridgman v. New Trier High Sch. Dist. No. 203, 128 F.3d 1146 (7th Cir.1997) (student ordered to empty pockets and remove outer jersey, hat, shoes, and socks based on inappropriate behavior, bloodshot eyes, and dilated pupils suggesting marijuana use); Cornfield ex rel. Lewis v. Consol. High Sch. Dist. No. 230, 991 F.2d 1316 (7th Cir.1993) (strip search of student suspected to be "crotching drugs" based observation of "unusual bulge" in crotch area seen by several school officials; student's agitation when confronted with the suspicion; knowledge of his many prior incidents involving drugs; and student's admission to teacher "that he was constantly thinking about drugs"); Williams ex rel. Williams v. Ellington, 936 F.2d 881 (6th Cir.1991) (strip search for drugs where another student reported that Williams and another girl had vial containing white powder, follow-up investigation strengthened suspicions, vial discovered in purse of Williams' companion); Tarter v. Raybuck, 742 F.2d 977 (6th Cir.1984) (reasonable to require male student to empty pockets and remove jacket, boots, and shirt where three administrators observed an exchange between him and another student believed to be drug transaction and principal smelled marijuana on his breath); Widener v. Frye, 809 F.Supp. 35 (S.D.Ohio 1992) (male student ordered to pull pants down and shorts up tight so anything concealed might be revealed where school authorities smelled marijuana on his person and he appeared sluggish).
While courts have given more latitude to school officials searching for drugs, the cases indicate that some level of individualized suspicion is required to venture beneath the outer clothing. And, after Redding, we are further instructed to implement a sliding-scale approach to the T.L.O. requirement that "the search as actually conducted [be] reasonably related in scope to the circumstances which justified the interference in the first place." T.L.O., 469 U.S. at 341, 105 S.Ct. at 743, 83 L.Ed.2d at 720 (emphasis *223 added). Thus, individualized suspicion was required in each case where the Academy's administrators made the "quantum leap" from the students' jackets, socks, and shoes to their undergarments. Without more, the overly generalized and uncorroborated tip that unnamed "pills that would cause kids to be unsafe" were coming into the school, sometimes in students' bras and underwear, was insufficient to validate a search of T.A.S.'s underwear. For, even in light of this information, the fact remains that there was no reason to suspect any of the students searched in the first place. Thus, proceeding to inspect T.A.S.'s bra was unreasonably excessive in scope, given that no additional facts, either known to the Academy prior to the less intrusive search of her belongings and outer clothing or discovered in the course thereof, could have caused officials to suspect her in particular or to believe that there were reasonable grounds for resorting to her underwear.
In light of the foregoing, when any group search is conducted in the absence of individualized suspicion, even if the circumstances otherwise permit less invasive searchesranging from personal effects and jackets, to pat-downs of the outer clothing, and even to searches of pockets, shoes, and sockssuch a search that subjects the students' undergarments or unclothed bodies to exposure is unconstitutional if school officials do not have reasonable grounds to believe the particular student possesses the item sought, unless the item is reasonably believed to be imminently dangerous. Although not at issue here, we can envision a clear exception to this rule if the object of the search seriously threatens the security and safety of the school and proceeding with a search lacking individualized suspicion could reasonably avoid immediate physical harm to those present on school grounds, such as when a dangerous weapon is involved and delaying the search is outweighed by the need to dispel the danger.[8]See e.g., Thompson v. Carthage Sch. Dist., 87 F.3d 979 (8th Cir.1996) (upholding search of pockets, jackets, shoes, and socks and, if metal detector sounded, some pat-downs, of all male sixth through twelfth graders after school bus driver informed principal about fresh cuts on bus seats and "that there was a gun at the school that morning," concluding "the decision to undertake this generalized but minimally intrusive search for dangerous weapons was constitutionally reasonable" where principal "had two independent reasons to suspect that one or more weapons had been brought to school that morning").[9] Academy officials in the case sub judice, however, had no reason to believe that the contraband at issue imperiled school safety.
We acknowledge that it is important to consider the role of school administrators, teachers, and school resource officers. Aside from providing education, schools have a legal obligation, acting in loco *224 parentis, to serve as caretakers while students are at school and have a duty to keep the schools safe. It follows that if school administrators become aware that there are illegal substances or drugs in schools that they exercise diligence to eliminate their presence, set standards, and keep students safe. Still, school resource officers, who are law enforcement officers first, are charged with safekeeping, serving as quasi-councilors, confidantes, and mediators. Like all law enforcement officers, school resource officers in North Carolina always have the authority, and, depending on the criminal act, the obligation to charge anyone, including students who they allege broke the law. Thus, the trial court's finding that the Academy has a "no penalty disclosure" policy that a "student is given the opportunity at the time of the search to disclose whether or not they possess weapons or drugs," and may avoid repercussions by disclosing is of no consequence when the search is conducted in the presence of a resource officer and another law enforcement officer.
The school's role to educate and to act in loco parentis is further complicated by the reality that schools' actions are governmental in nature and, unlike parents against whom there are no 4th Amendment rights, can, by conducting searches outside acceptable parameters, abridge students' 4th Amendment rights. Balancing the Academy's interest in the safety of the school's population against the individual rights of its students, this case, involving only the most generalized and vague reasons to suspect any presence of harmful substances in circulation, was clearly not one where it could have been conceivable that resorting to such an intrusive search of every student without engaging in any follow-up investigation whatsoever would be constitutionally permissible. Accordingly, we hold the trial court erred in concluding the search of T.A.S. was reasonable. Thus, we reverse its order denying her motion to suppress the fruits of the unconstitutional search.
Reversed.
Judge HUNTER, JR. concurs in result with separate opinion.
Judge STEELMAN dissents.
HUNTER, JR., ROBERT N., Judge, concurring in the result.
This case involves a motion made by a juvenile that invokes both the Fourth Amendment to the United States Constitution, which prohibits "unreasonable searches and seizures," and article I, section 20 of the North Carolina Constitution, which prohibits general warrants. Article I, section 20 provides:
General warrants, whereby any officer or other person may be commanded to search suspected places without evidence of the act committed, or to seize any person or persons not named, whose offense is not particularly described and supported by evidence, are dangerous to liberty and shall not be granted.
N.C. Const. art I, § 20.
Section 7B-2405 of our General Statutes grants a juvenile in a delinquency petition limited rights to contest the allegations of criminal conduct, including "[a]ll rights afforded adult offenders except the right to bail, the right of self-representation, and the right of trial by jury." N.C. Gen.Stat. § 7B-2405(6) (2009). Clearly, the right to be free of unreasonable searches and seizures under both the state and federal constitutions is among these rights. The protection of these rights is secured when, as here, a juvenile files a motion to suppress to exclude illegally obtained evidence.
Although neither party has directed this Court to appellate decisions from this State on warrantless searches, I find the proper legal analysis of the facts of this case in our recent opinion in Jones v. Graham Cnty. Bd. of Educ., 197 N.C.App. 279, 677 S.E.2d 171 (2009). See also In re Stumbo, 357 N.C. 279, 297, 582 S.E.2d 255, 266 (2003) (Martin, J., concurring) ("[P]ermitting government actors `to search suspected places without evidence of the act committed' . . . is tantamount to issuing a general warrant expressly prohibited by the North Carolina Constitution." (quoting N.C. Const. art. I, § 20)).
Key in the Jones analysis is the weight to be given to the assertion by the government *225 that a special need justifies the suspicionless search. Here, the State alleges a special need exists because of "the drug problem at the school and because the general student body is there as a result of school policy violations regarding drugs and weapons." Jones requires that
[w]here the government alleges "special needs" in justification of a suspicionless search, "courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." An important consideration in conducting the inquiry is whether there is "any indication of a concrete danger demanding departure from the Fourth Amendment's" usual requirement of individualized suspicion. The purpose of the inquiry is "to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context."
Jones, 197 N.C.App. at 290-91, 677 S.E.2d at 179 (citations omitted).
The majority's decision contains the analysis of federal law required by Jones, and I agree that Safford Unified School Dist. No. 1 v. Redding, ___ U.S. ___, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009), resolves this case.
Additionally, I would conclude the search at issue violates article I, section 20 of the North Carolina Constitution. My determination is based upon the difference in language between our Constitution and the United States Constitution. "`Our Constitution is more detailed and specific than the federal Constitution in the protection of the rights of its citizens.'" Jones, 197 N.C.App. at 288, 677 S.E.2d at 177-78 (quoting Corum v. Univ. of N. Carolina, 330 N.C. 761, 783, 413 S.E.2d 276, 290 (1992)). As such, "the United States Constitution provides a constitutional floor of fundamental rights guaranteed all citizens of the United States, while the state constitutions frequently give citizens of individual states basic rights in addition to those guaranteed by the United States Constitution." State v. Jackson, 348 N.C. 644, 648, 503 S.E.2d 101, 103 (1998), quoted with approval in Jones, 197 N.C.App. at 289, 677 S.E.2d at 178.
Where, as in this case, there is a close decision as to whether to allow a warrantless search, the language in our state constitution should tip the balance in favor of the privacy of the individual and against any warrantless searches by "any officer or other person," such as school boards.
STEELMAN, Judge dissenting.
Where TAS had a diminished privacy interest due to her attendance at an alternative school, the nature of the intrusion occasioned by the search in question was minimal, the governmental concern involved was important and immediate, and the search in question was an effective means of addressing that concern, the trial court did not err in denying TAs' motion to suppress. I must respectfully dissent.

I. Additional Facts
Additional facts should be noted. Students were sent to Brunswick County Academy ("the Academy") for violating the Brunswick County Code of Conduct, by engaging in violent behaviors and/or substance abuse. Pills, typically prescription medications, were discovered at the Academy two to three times within every nine week period. The Academy had a "no penalty disclosure" policy. If students voluntarily turned over items that were not allowed at the Academy, such as pills or weapons, then the student was not punished and law enforcement was not contacted. The Academy notified the student's parents, and the parents were required to pick up the contraband. Finally, the Academy's principal stated that during the search in question the girls' shirts remained down at all times, and no body parts were seen by the persons conducting the search.

II. Strip Search
At the heart of the majority opinion is the notion that TAS was subjected to a strip search by school authorities. This conclusion is not supported by the facts of this case.
I first note that on appeal, TAS does not challenge any of the trial court's findings of fact. The only arguments presented pertain to the trial court's conclusions of law. As such, the trial court's findings of fact are binding on appeal. Koufman v. Koufman, *226 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991). The search in question was described by the court in finding of fact eight:
each student was taken on an individual basis to another room in the school and the search was conducted. The search included shoes, book bags and coats. The school staff member or administration member conducting the search would pat down the socks. The girls were required to loosen their shirt tails and hook their thumbs under the bra and pull it out so that any contraband will fall out. No private parts were exposed.
The majority equates this search to that conducted in the case of Safford U. Sch. Dist. v. Redding, 557 U.S. ___, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009). That search was described as follows:
Romero and Schwallier directed Savana to remove her clothes down to her underwear, and then "pull out" her bra and the elastic band on her underpants. . . . The very fact of Savana's pulling her underwear away from her body in the presence of the two officials who were able to see her necessarily exposed her breasts and pelvic area to some degree, and both subjective and reasonable societal expectations of personal privacy support the treatment of such a search as categorically distinct, requiring distinct elements of justification on the part of school authorities for going beyond a search of outer clothing and belongings.
Id. at ___, 129 S.Ct. at 2641, 174 L.Ed.2d at 364.
It is readily apparent that the only common factor between the search of TAS in the instant case and Savana in the Safford case is that each girl was required to pull out her bra. However, that is where any similarity ends. TAS was completely clothed throughout the search, while Savana was required to remove her clothing down to her bra and panties.
There is no statutory definition for "strip search" in the North Carolina General Statutes, and the appellate courts of North Carolina have not defined the term. Therefore, "we must give it that meaning generally recognized by lexicographers." Clinard v. White, 129 N.C. 250, 251, 39 S.E. 960, 960 (1901). Black's Law Dictionary defines strip search as "[a] search of a person conducted after that person's clothes have been removed, the purpose [usually] being to find any contraband the person might be hiding." Black's Law Dictionary 1469 (9th ed.2009). The search of TAS in this case was not a strip search. It is apparent from the opinion of the United State Supreme Court in Safford that what they found offensive was the exposure of the breasts and pelvic area of Savana, when there was no prior information that the drugs were hidden in those areas. In the instant case no clothes were removed, and no private parts were exposed. The instant case clearly did not involve a strip search.

III. Presence of Information as to Location of Drugs
The rationale of Safford is not applicable to the instant case. The Court held in Safford that "what was missing from the suspected facts that pointed to Savana was any indication of danger to the students from the power of the drugs or their quantity, and any reason to suppose that Savana was carrying pills in her underwear." 557 U.S. at ___, 129 S.Ct. at 2642-43, 174 L.Ed.2d at 365 (emphasis added). In Safford there was no information that drugs were being concealed in the female student's bra; however, in the instant case school officials had been given specific information that pills were coming into the Academy hidden in the bras of female students. Further, the search in the instant case was much less intrusive than the one conducted in Safford. During the search in question no private parts were exposed, whereas in Safford the female student's breasts and pelvic area were exposed when she was searched.
The instant case is distinguishable from Safford based on the specific tip in the instant case that pills were coming into the school in the female students' bras, and the less intrusive nature of the search in the instant case.

IV. Suspicionless versus Suspicion-Based Searches
In New Jersey v. T.L.O., 469 U.S. 325, 341, 105 S.Ct. 733, 742-43, 83 L.Ed.2d 720, 734 *227 (1985), the Supreme Court articulated a test for determining the reasonableness of a school search based on individualized suspicion. This test was applied in Safford. In Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), the Supreme Court articulated the following test for determining the reasonableness of school searches not based upon individualized suspicion: (1) what is the nature of the privacy interest upon which the search intrudes? (2) what is the character of the intrusion that is complained of? and (3) what is the nature and immediacy of the governmental concern at issue here, and the efficacy of this means for meeting it? The Vernonia test was applied to a suspicionless search in Board of Education v. Earls, 536 U.S. 822, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002). The Supreme Court has established two frameworks for evaluating the reasonableness of school searches. The first addresses searches based on individualized suspicion, and the second addresses suspicionless searches. Because individualized suspicion was lacking in the instant case, I would apply the test for reasonableness articulated in Vernonia.

V. Vernonia Test

a. Nature of the Privacy Interest
The Supreme Court has repeatedly recognized that schoolchildren possess a diminished expectation of privacy while in school due to the "schools' custodial and tutelary responsibility for children." Vernonia, 515 U.S. at 656, 115 S.Ct. at 2392, 132 L.Ed.2d at 576; see T.L.O. 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720; Earls, 536 U.S. 822, 122 S.Ct. 2559, 153 L.Ed.2d 735.
TAS had a diminished expectation of privacy as a student for whom the Academy had responsibility. Vernonia, 515 U.S. at 656, 115 S.Ct. at 2392, 132 L.Ed.2d at 576. TAs' expectation of privacy was further diminished by the fact that she was attending an alternative school for students who had previously violated the Brunswick County Code of Conduct. Due to the "at risk" nature of the student body, each day when entering the Academy every student was required to pass through a metal detector and have their book bags, purses, coats, and like items searched. TAs' expectation of privacy was thus lowered by her attendance at an alternative school which more strictly monitored its student population, similar to adults working in a highly regulated industry. See Skinner v. Railway Labor Exec. Assn., 489 U.S. 602, 627, 109 S.Ct. 1402, 1418-19, 103 L.Ed.2d 639, 666 (1989); Vernonia, 515 U.S. at 657, 115 S.Ct. at 2392-93, 132 L.Ed.2d at 577.

b. Character of Intrusion
The search TAS was subjected to was only marginally more invasive than that to which she was subjected upon entering the Academy each morning. On 5 November 2008, TAS and the other female students of the Academy were asked to perform a bra lift to determine if they were hiding any pills in their bra. According to unchallenged finding of fact number eight "no private parts were exposed" during the search. TAS was fully aware that she would be subjected to a search upon entering the Academy, and the additional search that was conducted was only minimally more invasive.
Finally, the Academy had a "no penalty disclosure" policy in place. The trial court's unchallenged finding of fact four held if students disclosed the possession of weapons or drugs there were no consequences. TAS could have avoided any criminal consequences of her possession of drugs by turning over the contraband she possessed. I would hold that the privacy interests implicated by the search were not significant, particularly in light of the trial court's unchallenged findings of fact, which are binding upon appeal. Koufman, 330 N.C. at 97, 408 S.E.2d at 731.

c. Nature, Immediacy, and Efficacy

i. Nature of the Governmental Concern
The Supreme Court has clearly established that deterring drug use by our Nation's schoolchildren is an important governmental concern. Vernonia, 515 U.S. at 661-62, 115 S.Ct. at 2395, 132 L.Ed.2d at 579-80. The nature of the governmental concern in the instant case is even greater than the general concern for deterring drug use by schoolchildren in that the students in the instant case attended an alternative school for students *228 who had previously violated the code of conduct primarily as a result of substance abuse and/or violent behavior. The Academy students are even more vulnerable to the negative effects of drugs than typical schoolchildren.

ii. Immediacy of Governmental Concern
Evidence of an existing drug problem is not necessary to establish the immediacy of the governmental concern involved; however, it does help to "shore up an assertion of special need for a suspicionless general search program." Earls, 536 U.S. at 835, 122 S.Ct. at 2567-68, 153 L.Ed.2d at 748 (quotation omitted). There was evidence of drug use at the Academy. The principal of the Academy testified and the trial court found that drugs were intercepted at the Academy at least two or three times during each nine week grading period. I would hold that this, coupled with the "at risk" nature of the student body, provides evidence of the immediacy of the governmental concern at issue in the instant case.

iii. Efficacy of Means
The Supreme Court has "repeatedly refused to declare that only the `least intrusive' search practicable can be reasonable under the Fourth Amendment." Vernonia, 515 U.S. at 663, 115 S.Ct. at 2396, 132 L.Ed.2d at 581 (citation omitted). I would hold that the search in the instant case was effective at preventing and deterring drug use, particularly in light of the fact that the Supreme Court has made it clear that it will not engage in weighing arguments about least restrictive alternatives. Id. I would hold the trial court did not err in denying TAs' motion.

VI. Concurrence
The concurring opinion concludes that the search in the instant case violates Article I, Section 20 of the North Carolina Constitution. While TAS raised arguments under the North Carolina Constitution in her motion to suppress, TAS failed to make any argument under Article I, Section 20 of the North Carolina Constitution at trial or in her brief to this Court; therefore, this issue is not properly before this Court. State v. Ellis, ___ N.C.App. ___, ___, 696 S.E.2d 536, 539 (2010); N.C. R.App. P. 28(a). "It is not the role of this Court to fabricate and construct arguments not presented by the parties before it." Coker v. DaimlerChrysler Corp., 172 N.C.App. 386, 398, 617 S.E.2d 306, 314 (2005) (citation omitted), aff'd per curiam, 360 N.C. 398, 627 S.E.2d 461 (2006).

VII. Conclusion
Pursuant to the analysis articulated in Vernonia, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564, I would hold that the trial court did not err in denying TAs' motion to suppress.
NOTES
[1] The pseudonym T.A.S. is used to protect the identity of the juvenile.
[2] The record does not indicate whether the male students' underwear was subject to the search or, if so, how the inspection thereof was conducted. In fact, Ms. Robinson's testimony suggests that only the girls were subject to this more extensive search.
[3] The same standard applies here despite the presence of a law enforcement officer because, as found by the trial court, the search was conducted by school administrators and staff, and the school resource officer's role was limited to observation, as he did not participate in the actual search. See In re Murray, 136 N.C.App. 648, 650, 525 S.E.2d 496, 498 (2000) (holding search was conducted by school official where school resource officer "did not search the bag himself" or "conduct any investigation on his own," and therefore applying the T.L.O. reasonableness standard); see also In re J.F.M. & T.J.B., 168 N.C.App. 143, 148, 607 S.E.2d 304, 307 (2005) (holding the T.L.O. standard governs school searches when school resource officers who although employed by the local police department "are primarily responsible to the school district"are acting "in conjunction with school officials").
[4] Specifically, one week before the search, another student informed the assistant principal that "certain students were bringing drugs" to school and that he had gotten sick from pills "he got from a classmate." On the day of the search, the student informant indicated that Marissa Glines had given him a prescription-strength ibuprofen and that students were planning to take the pills at lunchtime, and a search of Marissa's pockets and wallet revealed several similar pills that she accused Savana of having given her. Savana admitted to the assistant principal that a planner containing various contraband itemsincluding several knives, lighters, and a cigarettewas hers but said she had lent it to Marissa. Other reports confirmed Marissa and Savana's friendshipsuch as school staff members' identification of the two girls "as part of an unusually rowdy group" at a recent school dance where alcohol and cigarettes were found in the girls' restroomand were sufficient to connect them to the pillswhere the same student informant had told the assistant principal that alcohol was being served at a party at Savana's house before the dance. Redding, ___ U.S. at ___, 129 S.Ct. at 2636, 2641, 174 L.Ed.2d at 360, 362-63.
[5] "With T.L.O. as the sole standard, the lower courts . . . struggled in relating its two-prong approach to the strip search context," and even after Redding, the question lingers as to whether "individualized suspicion [is] a prerequisite for permissible strip searches." Martin R. Gardner, Strip Searching Students: The Supreme Court's Latest Failure to Articulate a "Sufficiently Clear" Statement of Fourth Amendment Law, 80 Miss. L.J. 955, 964, 982 (2011). Gardner projects that "[g]iven the fact that school authorities historically have with some regularity conducted mass strip searches of students without individualized suspicion, it is probably only a matter of time before the Supreme Court will be required to address the issue." Id. at 983 (footnote omitted).
[6] Some courts, particularly those of the 6th Circuit, have applied the Vernonia individualized suspicion analysis within the context of the T.L.O. reasonableness test to answer the second inquiry thereof, i.e., whether the scope of the search was reasonable. See, e.g., Beard, 402 F.3d at 604 ("In making this determination [that the scope of the search did not pass constitutional muster], we are guided by the Supreme Court's analysis in Vernonia, which sets forth the relevant criteria for evaluating searches performed in the absence of individual suspicion.").
[7] Where T.L.O. explicitly declined to equate schools with prison searches, see T.L.O., 469 U.S. at 338-39, 105 S.Ct. at 741, 83 L.Ed.2d at 732-33 ("[I]t goes almost without saying that `[the] prisoner and the schoolchild stand in wholly different circumstances, separated by the harsh facts of criminal conviction and incarceration[;][w]e are not yet ready to hold that the schools and the prisons need be equated for purposes of the Fourth Amendment."), it is also noteworthy that the courts have overwhelmingly held that even prison officials must have reasonable, individualized suspicion before strip searching pre-trial detainees or arrestees who have not been convicted of the crime charged. See Brewer v. Hayman, No. Civ. No. 06-6294(DRD), 2009 WL 2139429, at *4 (D.N.J.Jul.10, 2009) (unpublished) (cases cited); see also Edgerly v. City & County of S.F., 599 F.3d 946, 958 (9th Cir.2010) (citing Redding and noting: "Similarly, we have held in the border search context that requiring an arrestee to expose only his or her undergarments `tend[s] toward [a] strip search in that if conducted in public it can be said to result in embarrassment to one of reasonable sensibilities.' We further held that, although it is `hardly feasible to enunciate a clear and simple standard for each possible degree of intrusiveness,' such a search requires `suspicion. . . founded on facts specifically relating to the person to be searched, and [that] the search [be] no more intrusive than necessary to obtain the truth respecting the suspicious circumstances.'").
[8] Interestingly, the Brunswick County Board of Education Policy Manual seems to impose a similar rule under § 4342 governing "Student Searches," but such was apparently not followed here:

If a frisk or "pat down" search of a student's person is conducted, it must be conducted in private by a school official of the same gender and with an adult witness present, when feasible.
If the school official has reasonable grounds for suspecting that the student has on his or her person an item imminently dangerous to the student or to others, a more intrusive search of the student's person may be conducted. Such a search may be conducted only in private by a school official of the same gender, with an adult witness of the same gender present, and only upon the prior approval of the superintendent or designee and to the extent so approved at the time, unless the health or safety of students will be endangered by the delay which might be caused by following these procedures.
[9] In fact, Thompson appears to be the only case where a mass search conducted without any level individualized suspicion has been held constitutional and, importantly, did not involve a strip search. While the above-mentioned exception is clearly appropriate, "[i]n none of the cases [from T.L.O. to Redding] did school officials conduct strip searches to find weapons hidden in students' underwear that might pose an imminent safety threat," and it is also a bit more difficult to imagine a scenario where administrators could believe that students are concealing a dangerous weapon in their undergarments. Barry C. Feld, T.L.O. and Redding's Unanswered (Misanswered) Fourth Amendment Questions: Few Rights and Fewer Remedies, 80 Miss. L.J. 847, 941-42 & n. 465 (2011).